STATE OF LOUISIANA

VERSUS

TWYENA THOMAS

NO. 19-KA-582

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 17-6321, DIVISION "O"
HONORABLE DANYELLE M. TAYLOR, JUDGE PRESIDING

July 29, 2020

**HANS J. LILJEBERG**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Stephen J. Windhorst, and Hans J. Liljeberg

<u>**AFFIRMED**</u>
  **HJL**
  **FHW**
  **SJW**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
 Honorable Paul D. Connick, Jr.
 Thomas J. Butler
 Anne M. Wallis
 Jennifer C. Voss
 Matthew Whitworth

COUNSEL FOR DEFENDANT/APPELLANT,
TWYENA THOMAS
 Bertha M. Hillman

**LILJEBERG, J.**

Defendant, Twyena Thomas, appeals her conviction and sentence for second degree murder. For the reasons that follow, we affirm defendant's conviction and sentence.

## PROCEDURAL BACKGROUND

On January 25, 2018, a Jefferson Parish Grand Jury indicted defendant, Twyena Thomas, with second degree murder of a juvenile in violation of La. R.S. 14:30.1. Defendant was arraigned and pled not guilty to the charged offense on January 26, 2018.

On August 12, 2019, the State filed a notice of intent to offer evidence of similar crimes, wrongs or acts engaged in by defendant pursuant to La. C.E. art. 412.4. In its notice, the State explained that defendant was charged with the second degree murder of her juvenile son while engaged in the perpetration of cruelty to a juvenile. The State indicated its intention to introduce evidence that on October 15, 2015, defendant committed a prior act of cruelty to a juvenile against this same son. Evidence pertaining to this incident, including medical records from Children's Hospital and statements from witnesses, were previously provided to defendant in open file discovery. The trial court overruled defendant's objection to the introduction of evidence of the prior act.

On August 20, 2019, trial began before a twelve-person jury, and on August 22, 2019, the jury reached a verdict of guilty as charged. On September 24, 2019, defendant filed a motion for new trial and a motion for acquittal notwithstanding the verdict. The trial court denied both motions on September 30, 2019. That same day, defendant was sentenced to life in prison at hard labor without the benefit of parole, probation, or suspension of sentence.

On October 1, 2019, defendant filed a motion to reconsider sentence and a motion for appeal. That same day, the trial court denied the motion to reconsider

19-KA-582                                   1

sentence and granted the motion for appeal. On appeal, defendant challenges the admissibility of the evidence of the prior act occurring on October 15, 2015, pursuant to La. C.E. art. 412.4.

**FACTS**

At 8:22 p.m. on September 30, 2017, Officer Alexandre Corey Monssen with the Kenner Police Department was dispatched on a medical call for assistance regarding a two-year-old having difficulty breathing. Five minutes after receiving the dispatch call, Officer Monssen knocked on the door to defendant's apartment in Kenner, Louisiana. Officer Monssen testified that defendant opened the door and "told [him] three statements: That [C.T.][1] had eaten dinner earlier that night and thrown his red dinner bowl; that [C.T.] had dropped out and hit the floor with his head; and that [C.T.] self induces vomiting so she has to tie his wrists as a method of prevention." Officer Monssen stated that he then asked where the person needing medical attention was; he was told that he was in the rear bedroom, so he followed defendant through the living room to that bedroom. Officer Monssen testified that there were three other young children present in the apartment; the eldest was crying and stated, "please don't take my mommy away."

Officer Monssen testified that once in the bedroom, he observed a young child lying on his back on a mattress in a minimally furnished room. Officer Monssen identified himself to the child, C.T., and, when he received no response, touched his shoulder. Officer Monssen stated that he could see C.T. was not breathing and that he felt cold. He also noticed that the child had a large bruise over his right eye. Officer Monssen radioed for emergency medical services, who advised him they were already on scene. Officer Monssen testified that he then saw paramedics enter the complex and signaled them to where he was located.

---

[1] C.T.'s initials are used under the authority of La. R.S. 46:1844(W)(3), which allows this Court to identify a crime victim who is a minor or a victim of a sex offense by using his or her initials.

Rogelio Lopez, a paramedic with East Jefferson Hospital, responded to a 9-1-1 call about difficulty breathing at the apartment complex on 31st Street in Kenner. Mr. Lopez testified that after making contact with Officer Monssen, he proceeded to the bedroom. Mr. Lopez stated that defendant told him "the baby had something in his mouth or something like that." Mr. Lopez stated that he could immediately tell C.T. was not breathing and proceeded to pick him up to check for a pulse; he found none. He did not find any obstructions in C.T's mouth or throat. He testified that the body was "room temperature," that there was bruising around the whole body, and that he appeared "almost dehydrated and malnutritioned to the point to where he was basically just desiccated. [He] looked like one of those Egyptian mummies to where they are just so dried and so withered away." Mr. Lopez observed some "pooling of the blood," which indicated a lapse of a half an hour to an hour since the child's death. Defendant asked Mr. Lopez how "her baby" was doing and was pacing back and forth and seemed a little nervous. In response, Mr. Lopez testified that he pointed at her, and said "You know what you did. You know exactly what you did."

Once in the ambulance, C.T. was further examined. His body was photographed, and ligature marks on both arms were measured. Mr. Lopez testified that the marks appeared to be recent, but that he did not see C.T. tied up on the bed. He also noted many old marks and scarring on C.T.'s "back side" ranging from many months old to fairly new. Mr. Lopez explained that there was not a part of C.T.'s body that did not have bruising and multiple stages of healing. He testified that there were no injuries from that day or any bleeding. Mr. Lopez further observed wrinkling and a split lip on the young victim caused by severe dehydration. He testified that the child was so malnutritioned that the body was "cannibalizing" its own muscles.

Dr. Hauth, the attending physician at the East Jefferson Hospital emergency room, pronounced C.T. dead at 8:40 p.m. Sean Carl Carson, a crime scene technician with the Kenner Police Department, was called to the apartment to document the death. Mr. Carson testified that he photographed and collected a sample of what appeared to be blood on the wall in the living room and bedroom. A presumptive field-test of the substances came back positive for the presence of blood. Other areas of the apartment and a soiled rag contained a similar looking substance, all of which field-tested positive for the presence of blood. Mr. Carson collected an open diaper that appeared to contain a red, blood-like substance. Mr. Carson further documented and collected a sample of what appeared to be vomit on the back of the toilet.

Both the State and defendant stipulated that Marcela Zozaya, DNA analyst for the Jefferson Parish Sheriff's Office crime lab, would testify that the swabs of blood-like substance collected from around the apartment and various items were, in fact, blood consistent with C.T.'s DNA and that the suspected vomit tested positive for saliva consistent with defendant's DNA.

Officer Monssen testified that after C.T. was put in the ambulance, defendant voluntarily accompanied him to the Kenner Police Department complex. Detective Jackson testified that he assisted Detective Peter Foltz, also with the Kenner Police Department, in interviewing defendant. Detective Jackson and Detective Foltz testified that they Mirandized[2] defendant prior to the interview. Detective Foltz stated that defendant was not under arrest at that time and it was a "pretty casual conversation" with "no real emotion involved."

During her statement, defendant explained that at the time of C.T.'s death, she lived in a three bedroom apartment in Kenner, which she moved into in July

---

[2] *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2017, with her four children ranging in ages from nine to one. She stated that she only had two beds because she was not working and could not afford a third bed. When asked about C.T.'s medical conditions, she explained that he experienced acid reflux shortly after birth and could not keep milk down. She explained that this problem was continuous through C.T.'s first year and the pediatrician recommended she give C.T. PediaSure. She stated that the last time she brought C.T. to the doctor was in April or May 2017, because he was underweight at only 25 pounds and was regurgitating his food. She explained that she had not brought C.T. to the doctor since that time, because she moved to Kenner and did not have transportation.

Defendant further explained that in the months prior to his death, C.T. would frequently force himself to throw up. He would also remove his diaper and play with and place his feces in his mouth. He would also put urine on his head as if he was washing his hair. She tried to ask him why he was doing these things, but he would not answer or simply repeated the question she posed to him. She speculated that he was acting out because she became pregnant again in May 2017. When asked whether C.T. exhibited these same problems during her prior pregnancy for her youngest child, defendant explained that C.T. was not with her during this time because he was with his nanny and went to a day care.

During the interview with detectives, defendant admitted that she would bind C.T.'s hands in front of him with a bandana to stop him from making himself throw up, or from removing his diaper. When detectives asked defendant about the numerous scabs on C.T.'s back, she admitted that she also tied C.T.'s hands behind his back while lying on the bed, and he would "wiggle" and fall off the bed. When asked about all of the bruises on C.T.'s body, defendant admitted that she caused some of the bruises on his arms and legs, when she hit him with a slipper. She stated that she hit him in order to get C.T. to answer her questions about why he

was playing with his urine and feces. The detectives also inquired about the blood on the walls in the bedroom and living room. In response, defendant stated that several days prior to his death, C.T. banged his head on the wall in these rooms causing either his mouth or nose to bleed. Defendant also explained that C.T. was constantly falling. When she would bath him, he would hit his head on the side of the tub. She said that several days prior to his death, C.T. fell out of her bed while they were sleeping and sustained a black eye.

Defendant stated that on the day of his death, C.T. threw his bowl while eating dinner and fell and hit his head. She said C.T. was shaking and having difficulty breathing. She explained that she moved him to a bed in the bedroom and tried CPR. She also made several calls to her brother, C.T.'s father and her mother, who told her to call an ambulance. The detectives told defendant that her daughter provided a different version of the events preceding C.T.'s death. They explained that her daughter told them that C.T. covered himself with his pee and feces while they were eating, and defendant went to give him a bath. The daughter also said she was not in the room when C.T. fell. Defendant denied this version of the events. Defendant consented to a search to obtain her DNA. After obtaining her DNA, the detectives placed defendant under arrest for cruelty to a juvenile.

Detective Foltz stated that defendant's cell phone was also seized that night, and according to the phone records, defendant either placed or received roughly twenty-six calls between 7:50 p.m. and the time she called 9-1-1. Sergeant Lashonda Woodfork testified as to a 9-1-1 call at 8:21 p.m. from defendant concerning a two-year-old male. During the call, defendant calmly told the dispatcher that her child had not eaten in several days and she gave him PediaSure, but that now he was having difficulty breathing.

Quina Herbert, defendant's cousin, testified that she received a call from defendant during which she stated, "'I need you to come to my house because I

don't know if [C.T.] dead or alive.'" Ms. Herbert asked if defendant had called the police, but learned defendant had not. Louis Thomas, defendant's brother, similarly testified that defendant called him that evening and said that C.T. "was breathing funny and something was going wrong." Mr. Thomas told defendant to hang up and call 9-1-1. Defendant's mother testified that she received a phone call from defendant and was told C.T. was not breathing. She also told defendant to hang up and call 9-1-1.

Ms. Herbert testified that after talking to defendant, she went to the apartment. When she located defendant, she was sitting on the ground with an officer standing next to her. Ms. Herbert repeatedly asked which hospital C.T. was taken to. Finally, the officer asked defendant, "should you tell her or should I?" Defendant then stood up and said, "He dead." Ms. Herbert described defendant saying it as if defendant said "it was just okay for him to be dead."

Ms. Herbert testified that she and defendant are certified nursing assistants, which requires a CNA license, as well as CPR certification. She testified that defendant lost multiple jobs due to being late or absent. She stated that when defendant became pregnant with C.T., defendant already had two children and was not sure if she wanted to have the baby or terminate the pregnancy. Ms. Herbert introduced defendant to, Ms. Alana Dayries, who did not have children and offered to help with C.T.

Ms. Dayries testified that defendant was pregnant when they met. She said the two discussed adoption and establishing a relationship; she intended to adopt C.T. when he was born. However, once C.T. was born, defendant decided to keep him, but told Ms. Dayries she could be his godmother. Ms. Herbert testified that she was with defendant when C.T. was born and that they lived with her for a few months. Ms. Dayries frequently took C.T. for the weekend and holidays, and sometimes kept him with her for up to a week.

While defendant lived in Kenner, Ms. Herbert took defendant to grocery shop once a month. On one occasion, defendant told Ms. Herbert about C.T. eating his feces. Ms. Herbert advised her to take him to the hospital, but she was not aware if she did or not. Ms. Herbert testified that C.T. had a big appetite and did not have any health issues she was aware of. Ms. Dayries similarly testified that when C.T. was a baby, he had no problems eating while in her care. Ms. Dayries testified that when it was time for C.T. to leave her, C.T.'s demeanor changed, and he did not want to go home. At the time, C.T. could not talk yet, and she thought the reaction was because she spoiled him. When Ms. Dayries last saw C.T., his behavior was strange, and he wore long pants and a long-sleeved shirt despite it being really warm that day.

Paula Gandolfi runs a charitable organization at Divine Mercy Church that provides free groceries and assists people in paying their utility bills. On August 3, 2017, defendant met with Ms. Gandolfi and applied for assistance. Ms. Gandolfi testified that defendant and two children met with her, and she thought the children looked malnourished. Defendant told Ms. Gandolfi that C.T. and the girl with her were twins. That day, the organization paid a portion of her Entergy bill. Ms. Gandolfi testified that she brought groceries to defendant on September 7, 2017. Defendant had not requested the groceries and was unaware she was bringing them. Ms. Gandolfi described her as "very sweet" during this interaction and did not recall noticing anything odd about C.T. She again delivered groceries to defendant on September 14, 2017. On September 21, 2017, she delivered more groceries and toys because the children had no toys and were not allowed to go outside and play at all. She testified that during the visit, C.T. was punished and kneeling in the corner. That same date, defendant posted on her Facebook page a photograph of a full plate of food. Ms. Gandolfi saw the post and testified that defendant was "bragging that she's going to eat it. The kids are not going to eat it."

C.T. was a patient at Daughters of Charity and was seen by Dr. Lolita Gonzales and other doctors there. Dr. Gonzales saw C.T. on May 18, 2017, for a cold, pink eye, an ear infection, and an upper respiratory tract infection. She testified that during that visit, she noted a "failure to thrive" in C.T.'s medical records, which meant that he was not achieving his weight milestones or that he was basically malnourished. Dr. Gonzales stated that his height was normal, but his weight at 20 pounds was below the third percentile; therefore, she recommended defendant give him PediaSure and provided a referral to receive the PediaSure for free. She testified that nothing in C.T.'s medical records indicated he had a medical reason for his low weight.

Dr. Gonzales saw C.T. again on May 31, 2017, to remove sutures from his ear put in by an emergency room doctor. Dr. Gonzales testified that the ear injury resulted from hitting his ear on the car door. Dr. Gonzales stated that she was concerned that C.T. had lost a pound since the visit earlier that month; because of this concern, she undressed him but saw no injuries, scars, or bruises. Dr. Gonzales testified that she did not see C.T. again after that visit.

Dr. Yen Vo, an expert in forensic pathology, testified regarding the autopsy she performed on C.T. on October 2, 2017. Dr. Vo noted C.T.'s sunken eyes, hollow cheeks, and evidence of trauma to the face, torso, and extremities. She further testified that she noted his prominent ribs and sunken abdomen. She noted multiple contusions to the face, older abrasions to the face, multiple abrasions of varying ages to his nose, and abrasions on his upper and lower lips. She testified that there was bruising on the forehead around the right eye and right temple area as well as the right jawline. She also testified that there was an abrasion on the right side of his face. Dr. Vo testified that on the left side of C.T.'s head, she found bruising from his left eye to his forehead and temple area. She testified that the abrasion to the nose was more recent and likely occurred within the past

twenty-four hours. She testified that there were different injuries in C.T.'s mouth in different stages of healing. Dr. Vo noted abrasions on the neck and chest as well as scarring, indicating old injuries. She stated that the only uninjured areas were his genitals, anus, and toes.

Dr. Vo could not determine the manner and cause of death based on her external examination and continued with an internal examination. By looking at the inside of the scalp, Dr. Vo counted at least fifteen areas of hemorrhage. She further found blood clots, bleeding, and a large area of blood around the brain, indicating to her that there was some kind of injury.[3] Dr. Vo testified that she consulted with a neuropathologist who found no evidence of a natural disease but did find evidence of injury. Dr. Vo noted C.T.'s loose skin, indicating possible dehydration and malnourishment. For C.T.'s age, the average weight is twenty-nine pounds; C.T. weighed fifteen pounds at his death. After examining him for causes of this low weight, Dr. Vo found no natural disease that would have prevented him from getting proper nutrition. Dr. Vo testified that while the malnourishment alone may be enough to explain his death, in C.T.'s "specific case the injuries to the head are more recent, they are more severe and they are what would explain his death acutely." Therefore, she certified the cause of death as multiple blunt force injuries and classified his death as a homicide.

Dr. Neha Mehta,[4] the medical director of the child abuse evaluation program at Children's Hospital in New Orleans, charted C.T.'s growth based on his medical records. She testified that at his last medical visit, he was at a low weight and would require ongoing medical follow up. She stated that his weight "plummets" after that visit and that at his death, C.T. was the average weight of a

---

[3] Dr. Vo testified that each area of bleeding indicates that each area was a point of impact and was not consistent with a single fall but more consistent with a vehicle accident or fifteen repeated falls from a significant height.

[4] Dr. Mehta was accepted as an expert in pediatrics and child abuse.

four-month-old infant. She testified that he was absolutely malnourished. Dr. Mehta testified that C.T. suffered from food deprivation, a severe form of child abuse, and that his injuries were not consistent with a fall. Dr. Mehta stated that the injuries and low weight show a "chronic, ongoing, dramatic maltreatment of a child" and that the failure to seek medical treatment for C.T. was a form of child abuse considered medical neglect. Dr. Mehta diagnosed C.T. with child torture.

Detective Sherry Theriot, custodian of records for the Jefferson Parish Correctional Center, testified as to the phone calls of persons housed in the Jefferson Parish Correctional Center. In the call, defendant stated she "used to whoop [her] baby and [she] accidentally killed [her] baby," and would take out her feelings about C.T.'s father on him. When asked by the other person on the phone if she hit him hard, she replied affirmatively.

*October 15, 2015 Incident*

Ms. Dayries testified regarding the prior incident on October 15, 2015, which the State sought to introduce pursuant to La. C.E. 412.4. She stated that on that day, C.T. was 4 months old and defendant called and asked what she should do because another child hit C.T. in the head. Ms. Dayries advised defendant to bring C.T to Children's Hospital in New Orleans and said she would meet them there. Once at the hospital, Ms. Dayries testified that she saw the "hickey" on C.T.'s head, and did not believe a child could have caused the injury. She stated that a woman bringing her and C.T. to the x-ray room questioned additional bruises on C.T. Ultimately, Ms. Dayries testified that the police and the Department of Children and Family Services (DCFS) arrived at the hospital.

Sharika Lewis, a child protection investigator with DCFS in Orleans Parish testified that she was on night call on October 16, 2015, when she received a call and began an investigation at Children's Hospital. During the investigation, she

learned that C.T. had a busted lip, bruises to both sides of the face, and swelling around one eye. She stated that at the time, defendant told her she left C.T. in a room with Caleb, defendant's four year-old child, while she was in the kitchen. Defendant told her that C.T. was in a bouncer unstrapped on defendant's bed, and he either fell to the floor or was pushed by Caleb. However, Ms. Lewis testified that she and C.T.'s doctors found his injuries inconsistent with defendant's statement. Ms. Lewis testified that the bed was only about three feet high, and the floor was carpeted. She ruled the case valid for lack of supervision, which "fall[s] under neglect" and "inconclusive for the bruises because [they] didn't have a definite on who actually did the injuries to [C.T.]." She concluded at the time that there was a moderate risk of abuse. Ms. Lewis stated that Detective Augusta with the New Orleans Police Department told her they were closing their case because they could not definitely pin the injuries to a particular person, despite suspecting abuse.

As per the DCFS safety plan, Ms. Dayries left the hospital with C.T. and was told defendant could not have him back until she completed parenting classes. Once defendant regained custody of C.T., Ms. Dayries' time with C.T. became more sporadic. Ms. Herbert stated that defendant cut Ms. Dayries out of their lives after DCFS allowed her to have C.T. back. While Ms. Herbert was babysitting C.T. on one occasion, she invited Ms. Dayries over, and C.T.'s father asked Ms. Dayries to help with C.T. Ms. Herbert testified that she, Ms. Dayries, and C.T.'s father told defendant to take Ms. Dayries' help, but this upset defendant, and the cousins did not speak for a year.

The jury also heard testimony from Dr. Anne Troy, an expert in forensic pediatrics and child abuse. Dr. Troy explained that she is a nurse practitioner at the Audrey Hepburn Care Center, and testified that on November 4, 2015, she examined C.T. in relation to an emergency room visit. She stated that there was

redness near the eye, blue bruising to the forehead and near the nose, and a cut to the lip. She stated that defendant said C.T.'s injuries were caused by a fall out of his swing when she stepped out of the room and that a sibling present may have been involved. She found this inconsistent with C.T.'s injuries. Dr. Troy testified that the emergency room confirmed the abuse and that it takes a significant amount of force to bruise a four-month-old. She agreed with the ER physician's assessments and was concerned about neglect. Dr. Troy also testified that the ER report she received contained a notation that defendant, when informed that the police and DCFS were being called, stated that she was leaving the hospital.

## DISCUSSION

In her sole assignment of error, defendant contends the trial court erred by allowing the state to introduce evidence regarding the October 15, 2015 incident pursuant to La. C.E. art. 412.4. Defendant contends the evidence is not relevant because she was not charged with a crime as a result of the incident, and further contends that the trial court failed to conduct the balancing test required under La. C.E. art. 412.4 prior to allowing the State to admit the evidence.

A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *State v. Kiger*, 13-69 (La. App. 5 Cir. 10/30/13), 128 So.3d 552, 557. The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the accused committed the charged crime because the defendant has committed other such crimes in the past. *State v. Williams*, 09-48 (La. App. 5 Cir. 10/27/09), 28 So.3d 357, 363, *writ denied*, 09-2565 (La. 5/7/10), 34 So.3d 860; *see also* La. C.E. art. 404(B)(1).

However, such evidence may be admitted pursuant to certain statutory and jurisprudential exceptions to the exclusionary rule. La. C.E. art. 412.4 provides such an exception and states in pertinent part:[5]

> A. When an accused is charged with a crime involving abusive behavior against a family member, household member, or dating partner or with acts which constitute cruelty involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving assaultive behavior against a family member, household member, or dating partner or acts which constitute cruelty involving a victim who was under the age of seventeen at the time of the offense, may be admissible and may be considered for its bearing on any matter to which it is relevant, subject to the balancing test provided in Article 403.
>
> ***
>
> D. For purposes of this Article:
>
> (1) "Abusive behavior" means any behavior of the offender involving the use or threatened use of force against the person or property of a family member, household member, or dating partner of the alleged offender.
>
> * * *
>
> (3) "Family member" means spouses, former spouses, parents and children, stepparents, stepchildren, foster parents and foster children.

Though little jurisprudence exists regarding the application of La. C.E. art. 412.4, in 2001, the Louisiana legislature enacted a similar provision, La. C.E. art. 412.2,[6] which allows the admission of evidence in sex offense cases of other

---

[5] La. C.E. art. 412.4 was enacted by Acts 2016, No. 399, § 1, effective August 1, 2016, and was amended by Acts 2017, No. 84, § 4, effective August 1, 2017. Prior to the enactment of this article, courts often upheld the admissibility of such evidence under La. C.E. art. 404(B). *State v. Galliano*, 02-2849 (La. 1/10/03), 839 So.2d 932; *State v. Mitchell*, 18-326 (La. App. 5 Cir. 12/27/18), 263 So.3d 967; *State v. Marshall*, 13-233 (La. App. 5 Cir. 10/30/13), 128 So.3d 1156.

[6] La. C.E. art. 412.2 provides as follows:

> A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
>
> B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.

crimes, wrongs or acts involving sexually assaultive behavior or which indicate a lustful disposition toward children. In *State v. Wright*, 11-141 (La. 12/6/11), 79 So.3d 309, 317, the Louisiana Supreme Court pointed out that in enacting La. C.E. art. 412.2, "the Legislature did not see fit to impose a restriction requiring such evidence to meet a stringent similarity requirement for admissibility." La. C.E. art. 412.2 was enacted to loosen restrictions on other crimes evidence. *Id*. at 317; *State v. Evans*, 19-237, p. 9 (La. App. 5 Cir. 6/3/20), 2020 WL 2893671. Thus, pursuant to La. C.E. art. 412.2, evidence of a prior sexual offense indicating that the defendant has a lustful disposition toward children is admissible if relevant and if the probative value outweighs the prejudicial effect. *Id.*

Considering the similarity between La. C.E. arts. 412.2 and 412.4, we find that evidence of prior acts of domestic abuse and cruelty to juveniles is also admissible if relevant and the probative value outweighs the prejudicial effect. The admissibility of evidence under this article is not limited to those actions that are identical or similar in nature to the charged crime. *See* Louisiana Practice Evidence Art. 412.4, Evidence of Similar Crimes, Wrongs, or Acts in Domestic Abuse Cases and Cruelty Against Juveniles Cases (2019 ed.).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. art. 401. A trial judge, in deciding the issue of relevancy, must determine whether the evidence bears a rational connection to the facts at issue in the case. *State v. Massey*, 11-358 (La. App. 5 Cir. 3/27/12), 97 So.3d 13, 35, *writ denied*, 12-993 (La. 9/21/12), 98 So.3d 332.

Even if relevant, "evidence may be excluded if its probative value is

---

C.   This Article shall not be construed to limit the admission or consideration of evidence under any other rule.

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 403. Any inculpatory evidence, however, is "prejudicial" to a defendant, especially when it is "probative" to a high degree. *State v. Rodgers*, 16-14 (La. App. 5 Cir. 10/26/16), 202 So.3d 1189, 1201, *writs denied*, 16-2189 (La. 9/15/17), 225 So.3d 479 and 16-2093 (La. 1/29/18), 235 So.3d 1104. As used in the balancing test, prejudice limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. *Id.*

Because there is "hardly any evidence more 'prejudicial' than evidence of child abuse," the evidence at issue must be "unduly" and "unfairly" prejudicial to be excluded. Prior bad acts in child abuse cases should be viewed through this lens. *State v. Robertson*, 15-2095 (La. 2/5/16), 183 So.3d 1287, 1290. The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged. *Wright*, 79 So.3d at 318.

The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. *State v. Miller*, 10-718 (La. App. 5 Cir. 12/28/11), 83 So.3d 178, 187, *writ denied*, 12-282 (La. 5/18/12), 89 So.3d 1191, *cert. denied*, 568 U.S. 1157, 133 S.Ct. 1238, 185 L.Ed.2d 177 (2013).

The second degree murder charge in this case was based upon the killing of C.T. during the commission or attempted commission of cruelty to a juvenile. Under La. R.S. 14:93, in order to prove cruelty to a juvenile, the State was required to show that defendant intentionally or with criminal negligence mistreated or abused C.T., and caused him unjustifiable pain or suffering. Criminally negligent mistreatment or neglect of the juvenile exists when, although neither specific nor general intent is present, there is such disregard of the interest of the juvenile that

defendant's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. *State v. Henderson*, 13-74 (La. App. 1 Cir. 9/13/13), 135 So.3d 36, 48, *writ denied,* 13-2327 (La. 3/21/14), 135 So.3d 617; La. R.S. 14:12.

In the instant matter, evidence of defendant's previous abuse of the victim in October 2015 is relevant and meets the balancing test set forth in La. C.E. 403. The juvenile victim, C.T., died of blunt force trauma injuries to the front and back of his head. In October 2015, the victim was admitted to Children's Hospital for trauma injuries to his head, bruising on both eyes, bilateral cheeks and forehead as well as a busted lip - injuries similar to those causing his death in September 2017. Staff at Children's Hospital contacted the New Orleans Police Department and the Department of Children and Family Services to report the abuse, and C.T. was removed from defendant's care and custody as a result.

The admission of evidence pertaining to the 2015 incident makes the element of the underlying offense of cruelty to a juvenile more or less probable than it would be without the evidence and is thus relevant. Evidence of the 2015 incident could make it more probable that defendant mistreated or abused C.T. and ultimately caused his death. Further, the prior incident bears a rational connection to the facts at issue because they both involve the same parties and similar injuries.

Further, the 2015 incident is probative to establish the relationship and abuse between defendant and C.T. *See State v. Porter*, 19-221 (La. App. 3 Cir. 8/14/19), 279 So.3d 1010, 1021. Evidence of child abuse is highly prejudicial; however, it is not so inflammatory as to create an unacceptable risk of luring jurors "into declaring guilt on a ground different from proof specific to the offense charged." *State v. Galliano*, 02-2849 (La. 1/10/03), 839 So.2d 932, 934. Accordingly, the prejudicial effect is greatly outweighed by the probative value because it

demonstrates a similar bad act of cruelty to a juvenile against the same victim in a documented instance.

Even if the trial court erred in allowing admission of the evidence, the erroneous admission of other crimes evidence is subject to harmless error analysis. *State v. Williams*, 05-318 (La. 1/17/06), 921 So.2d 1033, 1036, *writ denied*, 06-973 (La. 11/3/06), 940 So.2d 654. The test for determining whether an error is harmless is whether the verdict actually rendered in this case was surely unattributable to the error. *Id.*

The guilty verdict returned in this case was unattributable to any erroneously admitted evidence of similar wrongs or acts. The record indicates that an abundance of evidence was presented as to defendant's guilt. The jury heard from witnesses and experts as to C.T.'s low weight, dehydration, and multitude of injuries unrelated to the 2015 incident at issue. The jury heard that C.T. had multiple areas of hemorrhaging and that his cause of death was due to blunt force injuries. The jury heard a call made by defendant where she stated that she "whooped" C.T. and accidentally killed him. The jury saw photographs of the young victim's body both at the time of his death and during the autopsy. The jury heard that defendant either placed or received roughly twenty-six calls immediately preceding her call to 9-1-1. Therefore, even if improperly admitted, sufficient evidence exists apart from the other crimes evidence to support defendant's conviction of second degree murder, and the verdict in this case was unattributable to any error regarding the admission of the prior incident of abuse.

**ERROR PATENT DISCUSSION**

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). The review reveals no errors patent in this case.

## DECREE

Accordingly, for the foregoing reasons, this Court affirms defendant's conviction and sentence.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **JULY 29, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

**19-KA-582**

### E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE DANYELLE M. TAYLOR (DISTRICT JUDGE)
ANNE M. WALLIS (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          BERTHA M. HILLMAN (APPELLANT)

### MAILED

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
JENNIFER C. VOSS (APPELLEE)
MATTHEW WHITWORTH (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053